WESTERN UNION TELEGRAPH CO. v. LOUISVILLE & N. R. CO.

(District Court, N. D. Georgia. December 30, 1915.)

No. 67.

1. COURTS ⊚⟲274—UNITED STATES COURTS—DISTRICT IN WHICH SUIT SHOULD BE BROUGHT.

Under Judicial Code (Act March 3, 1911, c. 231) § 57, 36 Stat. 1102 (Comp. St. 1913, § 1039), relative to ordering absent defendants to appear and plead in suits to enforce any legal or equitable lien upon or claim to real or personal property within the district where the suit is brought, a suit by a New York telegraph corporation to enjoin a Kentucky railroad corporation from removing or interfering with the telegraph company's lines on the right of way within the Northern District of Georgia was maintainable in that district, as it involved a claim to an easement in land or right to occupy land.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 814; Dec. Dig. ⊚⟲274.]

2. COURTS ⊚⟲276—UNITED STATES COURTS—WAIVER OF OBJECTIONS TO ACTION IN WRONG DISTRICT.

In an action in the Northern district of Georgia by a New York corporation against a Kentucky corporation, defendant waived its right to object that the suit was not brought in the proper district by appearing and filing a motion to dismiss the case on the merits.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 815; Dec. Dig. ⊚⟲276.]

3. TELEGRAPHS AND TELEPHONES ⊚⟲11—USE OF RAILROAD RIGHTS OF WAY—CONSTRUCTION OF CONTRACTS.

The A. Railroad Co., owning telegraph lines on its right of way, conveyed such lines to the W. Telegraph Co., and entered into a working agreement with it respecting the use and maintenance of such lines. The A. Co. subsequently conveyed all of its property to the L. Railroad Co. Some time prior thereto a contract had been made between the L. Co. and the W. Co. whereby the L. Co., so far as it legally might, granted and agreed to assure to the telegraph company an exclusive right of way on and along the line, lands, and bridges of all roads then or thereafter owned, leased, controlled, or operated by it, for the construction and use of such lines of poles and wires as the telegraph company might require. The contract stated that it was intended to cover and embrace all railroad lines then owned, leased, controlled, or operated by the L. Co., and also any branches thereafter constructed or any other railroads that might be acquired by it. *Held*, that the A. Co.'s road, having been acquired by the L. Co. during the existence of the agreement, was embraced within the contract, and the contract was operative with respect thereto.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 7; Dec. Dig. ⊚⟲11.]

4. TELEGRAPHS AND TELEPHONES ⊚⟲11—USE OF RAILROAD RIGHTS OF WAY—CONSTRUCTION OF CONTRACTS.

A contract between a railroad company and a telegraph company provided that the railroad company, so far as it legally might, thereby granted and agreed to assure to the telegraph company an exclusive right of way on and along the railroad's lines for the construction and use of such lines of poles and wires as the telegraph company might require, together with the exclusive right to maintain offices in its depots for telegraph business. It further provided that it should supersede prior agreements between the parties, and should continue in force for 25 years, and thereafter until the expiration of one year after written notice had been given by one party to the other of a desire or intention to terminate it.

*Held,* that the agreement gave the telegraph company no irrevocable or perpetual right in and upon the railroad right of way, but simply the right to use and occupy such right of way until the expiration of the contract, and after the expiration of the 25 years either party had a right to terminate the contract by giving notice.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 7; Dec. Dig. ☞11.]

5. EMINENT DOMAIN ☞166—JURISDICTION—COURTS OF EQUITY.

Where a railroad company had notified a telegraph company to remove its lines from the railroad right of way and vacate the right of way after the expiration of a contract between the companies authorizing the telegraph company to use and occupy the right of way, a court of equity had no power to condemn the property and fix the amount of compensation to be paid to the railroad company by the telegraph company.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 448–450, 456; Dec. Dig. ☞166.]

In Equity. Suit by the Western Union Telegraph Company against the Louisville & Nashville Railroad Company. On motion to dismiss. Motion granted.

W. L. Clay, of Savannah, Ga., and Dorsey, Brewster, Howell & Heyman, of Atlanta, Ga., for plaintiff.

Henry L. Stone, of Louisville, Ky., and Tye, Peeples & Jordan, of Atlanta, Ga., for defendant.

NEWMAN, District Judge. This is a bill filed by the Western Union Telegraph Company, a citizen of the state of New York, against the Louisville & Nashville Railroad Company, a citizen of the state of Kentucky, and the case is now heard on a motion to dismiss, which has the same effect as a demurrer under the old practice and before the new equity rules were adopted.

[1, 2] The question of jurisdiction is raised at the threshold of this case, but I think that objection to the plaintiff's proceeding is without merit. In the first place, I think it is a claim to an easement in land, or right to occupy land, whatever the plaintiff's claim may be exactly, and, being a claim to a right to occupy land, it is either realty or personalty and within this district. So it seems to me to come within the very terms of section 57 of the new Judicial Code, which is a codification of Act March 3, 1875, c. 137, 18 Stat. 472. But, even if this were not true, I think the defendant has waived that right by its appearance and filing its motion to dismiss the case on the merits.

In Eldorado Coal & Mining Co. v. Mariotti, 215 Fed. 51, 131 C. C. A. 359, the Circuit Court of Appeals for the Seventh Circuit had this question before it, and the second headnote of the decision will be sufficient to show what was held. That is as follows:

"Judicial Code (Act March 3, 1911, c. 231) § 51, 36 Stat. 1101 (U. S. Comp. St. Supp. 1911, p. 150), provides that except as otherwise provided no civil suit shall be brought in any District Court against any person by any original process or proceeding in any other district than that whereof he is an inhabitant, but where the jurisdiction is founded only on diversity of citizenship, suit shall be brought only in the district of the residence of either the plaintiff or defendant. *Held,* that where a federal court had jurisdiction of the subject-matter, defendant's right to object on the ground that the suit

was brought in the wrong district was one of privilege and might be and was waived by a general appearance to demur to the merits."

In Adler Goldman Commission Co. et al. v. Williams et al. (D. C.) 211 Fed. 530, Judge Trieber, in the District Court for the Western District of Arkansas, held the same way, as shown by the third headnote to that case, which is as follows:

"In a suit in a United States District Court between citizens of different states to set aside alleged fraudulent conveyances, defendants waived their objections to the bringing of the suit in a district in which none of the parties resided, by moving to dismiss not only on that ground, but also for insufficiency of the bill, since the diversity of citizenship gave some United States court jurisdiction, and the defendant by pleading to the merits in effect appeared generally and waived all special privileges in respect to the particular court in which the action was brought."

Both of these cases cite In re Moore, 209 U. S. 490, 28 Sup. Ct. 706, 52 L. Ed. 904, 14 Ann. Cas. 1164, which is the authority mainly relied upon for these decisions. This Moore Case followed In re Wisner, 203 U. S. 449, 27 Sup. Ct. 150, 51 L. Ed. 264, in which it was thought a different rule may have been laid down, but which the court, in the Moore Case, settled, the Chief Justice, who delivered the opinion in the Wisner Case, dissenting, and the Moore Case is now, I think, accepted as final and conclusive on this question.

I think the jurisdiction of the court in this case exists, and the objection to the jurisdiction of the court must be overruled.

The object of the bill and the issues presented are similar in many respects to those considered and disposed of in the case of Western Union Telegraph Company v. Atlanta & West Point Railroad Company et al., 227 Fed. 465, recently by this court. An opinion was filed by the court here in that case, and a decree entered dismissing the bill.

The controversy is as to the right of the Western Union Telegraph Company to occupy the right of way of the Louisville & Nashville Railroad Company on its line from Marietta, Ga., through Blue Ridge, to the Tennessee state line, and on its branch line leading from Blue Ridge, Ga., to Murphy, N. C., from Blue Ridge, Ga., to the North Carolina state line.

The history of the railroad and the telegraph company, and their relation to each other, seems to be as follows:

The Marietta & North Georgia Railroad Company was in the hands of the United States court for this district, and was sold in 1896, and the purchaser became incorporated as the Atlanta, Knoxville & Northern Railway Company. Prior to February, 1898, the line of telegraph had been constructed along this railroad from Marietta to Blue Ridge, and thence along the two branches just mentioned to the Tennessee and North Carolina state lines, respectively, so far as material here; one of the lines really extending to Knoxville, Tenn., and the other to Murphy, N. C. These lines of telegraph became the property of the Atlanta, Knoxville & Northern Railway Company some time prior to February 9, 1898.

In February, 1898, the Atlanta, Knoxville & Northern Railway Company, in consideration of the sum of $19,000 paid to it by the Western Union Telegraph Company, conveyed to the telegraph company all of

the telegraph lines from Marietta to Blue Ridge, and thence along the two branches to the state lines referred to. On February 11, 1905, the Atlanta, Knoxville & Northern Railway Company conveyed all of its railroad properties to the Louisville & Nashville Railroad Company.

On June 18, 1884, a contract had been entered into between the Louisville & Nashville Railroad Company and the Western Union Telegraph Company, in which it was recited that:

"Whereas, the operation of the telegraph company's lines along the various railroads owned, controlled, or operated by the railroad company, has been conducted under the provisions of an agreement between the parties hereto, dated May 14, 1880, which agreement provides that it may be terminated on one year's written notice after July 1, 1885; and whereas, it is desirable that a new agreement should be entered into between the parties hereto:

"Now, therefore, for and in consideration of the covenants and agreements herein contained, the parties hereto mutually agree as follows: This contract is intended to cover and shall embrace all the railroad lines now owned, leased, controlled, or operated by the railroad company, which are as follows: [Then, setting out a number of railroads then owned, leased, controlled, or operated, it further provides:] And this contract is also intended to cover, and it shall include, any branch or branches that may be constructed by the railroad company or other railroad or railroads that may be acquired by it, either by lease or purchase, or that may be controlled or operated by it during the existence of this agreement, should it be lawfully competent to include it or them."

The second paragraph of the contract provides as follows:

"The railroad company, so far as it legally may, hereby grants and agrees to assure the telegraph company, the exclusive right of way on and along the line, lands, and bridges of all roads now owned, leased, controlled, or operated by said railroad company, or which it may hereafter own, lease, control, or operate, for the construction and use of such lines of poles and wires or underground wires for commercial or public uses or business as the telegraph company may require, together with the exclusive right to maintain offices in its depots for commercial telegraph business, and the railroad company will not transport men or materials, for the construction or operation of any line of poles and wire or wires for other lines in competition with the lines of said telegraph company party hereto, except at and for the railroad company's regular local tariff rates, nor will it furnish for such competing line or lines any facilities or assistance which it may lawfully withhold nor stop its trains, nor distribute material therefor at other than regular stations: Provided, always, that in protecting and defending the exclusive grants conveyed by this contract the telegraph company may use and proceed in the corporate name of the railroad company, but shall indemnify and save harmless the railroad company from any and all damages, costs, charges, and legal expenses incurred therein or thereby."

The contract proceeds then with a number of stipulations between the parties in reference to the construction and the maintenance of the telegraph lines and the use of the same, and a number of things that the telegraph company was to do and that the railroad company was to do, stipulating in this way on to and through the tenth paragraph of the agreement. The eleventh paragraph of the agreement provides:

"It is mutually understood and agreed that the telegraph lines and wires covered by this contract shall form a part of the general system of the telegraph company, and as such in the department of commercial or public telegraph business shall be controlled and regulated by it, the telegraph company fixing and determining all tariffs for the transmission of messages and all

connections with other lines. The railroad company further agrees that its employés shall transmit all commercial telegraph business offered at its offices over the lines of the telegraph company party hereto and shall account to the telegraph company exclusively for all such business and the receipts thereon as provided herein. No employé of the railroad company shall, while in its service, be employed by any other telegraph company than the telegraph company party hereto. The provisions of this agreement shall supersede said agreement hereinbefore mentioned and all other agreements between the parties hereto or their respective predecessors in ownership or control of their respective properties; and the provisions of this agreement shall be and continue in force for and during the term of twenty-five (25) years from and after the first (1st) day of July, 1884, and thereafter until the expiration of one year after written notice shall have been given by one of the parties hereto to the other of a desire or intention to terminate the same, and in case of any disagreement concerning the true intent and meaning of any of said provisions the subject of such difference shall be referred to three arbitrators, one to be chosen by each party hereto, and the third by the two others chosen and the decision of such arbitrators, or a majority thereof, shall be final and conclusive: Provided, that, should the lease or control of any railroad now held by the railroad company terminate before the expiration of the twenty-five years hereinbefore specified, this contract shall not cover such railroad after the termination of such lease or control, unless the same should be renewed within the said term of twenty-five years, or unless the owner or lessee of such railroad shall ratify this agreement, and should the railroad company cease from any cause to own any railroad or branch herein mentioned, this contract shall continue to apply to such railroad or branch if the telegraph company shall so elect, the railroad company agreeing that, in case it shall part with the ownership or control of any railroad it will require the purchaser or lessee thereof to accept the obligations and benefits of this agreement, if the telegraph company shall elect to continue to apply this agreement to such road: Provided, however, and it is hereby expressly stipulated and agreed that if any of the provisions of this agreement shall be found unusually burdensome or oppressive to either party, such party after having given ninety (90) days' written notice to the other may propose such amendments or changes to this agreement as it may deem just and equitable and consistent with the general tenor of this agreement. In case the parties hereto shall not be able to agree upon such proposed amendments or changes, the same shall be referred to and settled by arbitrators in the manner hereinbefore provided, it being understood and agreed that the powers of such arbitrators shall not extend to making either wholly or substantially a new contract, but simply to the relief of either party from any provisions complained of, which experience under the agreement shall have proved to be inequitable, and the operation of which may not now be foreseen by the parties hereto. The decision of such arbitrators shall be binding upon the parties hereto and shall thereafter stand as a part of this agreement without further act of the parties, unless modified or amended by some future decision of arbitrators as herein provided."

This contract appears to have been properly executed by the parties and to have gone into effect. There had been an agreement between the Western Union Telegraph Company and the Atlanta, Knoxville & Northern Railroad Company, dated February 16, 1898, in which it was recited that:

"Whereas, the telegraph company has, by conveyance of even date herewith, purchased the telegraph lines along the railway company's road from Knoxville, Tenn., to Marietta, Ga., and from Blue Ridge, Ga., to Murphy, N. C., said purchase having been made on condition that a working agreement be entered into between the parties hereto covering said railroads and said telegraph lines, and any extensions or branches of said railroads, and any railroads hereafter owned, leased, or controlled by the railway company party hereto."

And it then provides for various things to be done by the parties to the contract, none of which seems to me to be material in determining the questions now before the court.

The important questions are, first, when the Louisville & Nashville Railroad Company acquired this property, did the contract theretofore made between it and the Western Union Telegraph Company become operative as to these properties and the telegraph lines thereon? and, second, if it did, what is the meaning of the contract between the parties?

[3] It is perfectly clear to me that the contract between these parties was intended to cover lines then owned, leased, or operated by the Louisville & Nashville Railroad Company on which the telegraph company then had lines, and any lines of railroad which should thereafter be acquired by the railroad company. The language of the contract is too plain to be misunderstood. It is this:

"This contract is intended to cover and shall embrace all the railroad lines now owned, leased, controlled, or operated by the railroad company. [Then naming a number of lines and proceeding:] This contract is also intended to cover, and it shall include, any branch or branches that may be constructed by the railroad company or other railroad or railroads that may be acquired by it, either by lease or purchase, or that may be controlled or operated by it during the existence of this agreement, should it be lawfully competent to include it or them."

It seems to me entirely clear that this contract, at the time it was made, was deemed for the mutual benefit of the parties. It was intended by the railroad company to give to the telegraph company the right to construct and operate its lines and system along and upon its right of way as to all of the railroads it then owned, controlled, or operated, under lease or otherwise, or that it should thereafter own, control, or operate, during the existence of this agreement, and the telegraph company agreed, as to any lines of telegraph it might have then or might thereafter have on any such railroads, that they should be subject to and come within this contract.

The railroad line now in controversy is certainly a railroad that was acquired by the Louisville & Nashville Railroad Company, by purchase, during the existence of the agreement, and, if so, it is clearly embraced within the contract, and the telegraph company agreed that it should be by accepting, agreeing to, and legally executing the contract.

[4] What was granted by the railroad company to the telegraph company under this contract is as follows:

"The railroad company, so far as it legally may, hereby grants and agrees to assure the telegraph company, the exclusive right of way on and along the lines, lands, and bridges of all roads now owned, leased, controlled, or operated by said railroad company, or which it may hereafter own, lease, control, or operate, for the construction and use of such lines of poles and wires or underground wires for commercial or public uses or business as the telegraph company may require, together with the exclusive right to maintain offices in its depots for commercial telegraph business."

This right, whatever it may be, was to exist for 25 years from and after the 1st day of July, 1884, and thereafter until the expiration of one year after written notice was given by one of the parties to the

other of its desire to terminate the same. The 25 years expired on the 1st day of July, 1909. After that either party had a right to give to the other written notice, and the party to whom the notice was given would have one year in which to make other arrangements.

In 1905, according to the allegations of the bill, the telegraph company constructed a line of telegraph on or along the right of way of defendant's railroad from Junta, in Bartow county, northwardly through the counties of Bartow, Gordon, and Murray, to the northern boundary line of Georgia, and thence northwardly to Knoxville, Tenn., and since said construction of said line it has been continuously maintained and operated, and the telegraph company has been in possession and control of it. As to this new line, which was along a piece of railroad then being built by the railroad company, the plaintiff claims a perpetual, irrevocable, assignable easement or right to construct, maintain, and operate the same upon or along said railroad and right of way of defendant, and the claim is that the plaintiff has continuously, from the time of building said telegraph line until the time of the filing of this bill, been, and still is, in possession of said line and of said easements, rights, and franchises.

There is an additional telegraph line, according to the bill, from Cartersville, Ga., to Junta, Ga., a distance of $1^3/10$ miles, which is along the right of way of the Western & Atlantic Railroad. This telegraph line, built in 1905, was during the existence of the contract between the plaintiff and defendant, and comes within, and is subject to and controlled by, that contract. Therefore what has been said with reference to the main line clearly applies to this line, because it is unquestionably within the terms of the contract.

The bill alleges that:

"On or about August 5, 1912, defendant notified your orator that on and after August 17, 1912, the use and occupation of its railroad rights of way or any part thereof, including its said right of way in Georgia, and its stations, buildings, and offices, including those in Georgia, by your orator as and for a telegraph line, would be without its permission and against its will and consent, and notified your orator to vacate defendant's railroad rights of way, buildings, offices, stations, and premises, and to commence to remove therefrom immediately after August 17, 1912, and not later than September 1, 1912, all of your orator's telegraph lines, and all poles, wires, crossarms, batteries, instruments, appliances, and fixtures appurtenant or belonging thereto, and to complete the removal thereof prior to December 1, 1912, and that, failing to vacate defendant's right of way and premises, or in the event of your orator's failure or refusal to remove therefrom your orator's poles, crossarms, wires, batteries, instruments, appliances, and other fixtures, or any part thereof, prior to December 1, 1912, as demanded, that then and in that event defendant would take possession, appropriate, and use all and singular the said poles, crossarms, wires, batteries, instruments, appliances, and other fixtures, or so much thereof as may, on or after December 1, 1912, be or remain on defendant's rights of way or premises, including those in Georgia, and both use, operate, maintain, or otherwise dispose of the same as defendant's own property, and refuse to longer permit your orator to remove or use the same in any manner or for any purpose."

The plaintiff here claims the same rights under the act of Congress of July 24, 1866, that it claimed in the Atlanta & West Point Case above referred to. It is unnecessary for me to go over that again,

as I have stated my views about it fully in the opinion filed in that case.

[5] The plaintiff also prays that, if it finds against the right of the plaintiff to continue to occupy the right of way of the railroad company, this court will find what would be reasonable compensation for it to pay the defendant for the purpose of obtaining an irrevocable, assignable, and perpetual easement or right in, upon, along, under, through, or over defendant's right of way and property for the purpose of maintaining, reconstructing, repairing, and operating its telegraph lines now upon and along said right of way. The prayer in this respect is that the court, in some proper way, condemn the property and fix the amount of compensation to be paid to the railroad company by the telegraph company.

It has already been determined by this court in the Atlanta & West Point Case that a court of equity has no such power. The opinion expressed then is entertained now, and the court is therefore unable to take any such action as is prayed in this respect. All that it appears necessary to determine here is whether or not the property in question, when it came to be owned by the parties to the contract of 1884, came within that contract, and whether that contract must control.

I think the contract does control, and that it only gave to the telegraph company the right to remain upon the right of way of the railroad company until the expiration of the contract. It does not give to the telegraph company any irrevocable, assignable, and perpetual right in and upon the railroad company's right of way, as claimed, but gives it simply the right to use and occupy the right of way until the expiration of the contract. The railroad company clearly had the right to give the notice when it did in 1912, the period of time fixed by the contract having expired, and its right to give this notice and to insist upon compliance therewith must be sustained.

The bill showing upon its face that no relief thereunder can be granted, and the defendant having filed a motion to dismiss, upon which the case is now heard, the motion to dismiss should be granted, and a decree may be taken to that effect.